UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WILLIAM EVERAGE,<br><br>Plaintiff,<br><br>v.<br><br>CENTURION HEALTH OF INDIANA, LLC, SAMUEL J. BYRD M.D., Medical Director at Wabash Valley Correctional Facility,<br><br>Defendants. | ) | No. 2:24-cv-00321-JRO-MG |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Everage, an inmate at Wabash Valley Correctional Facility ("Wabash Valley"), filed this action under 42 U.S.C. § 1983 alleging Defendants were deliberately indifferent in violation of the Eighth Amendment with respect to treatment of Everage's broken clavicle. Defendants have moved for summary judgment. Dkt. [50]. For the reasons below, that motion is **GRANTED**.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has

to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. BACKGROUND

### A. Facts

Defendants have moved for summary judgment under Rule 56(a), therefore the Court views and recites the evidence in the light most favorable to Everage and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

Everage is an inmate at Wabash Valley. Dkt. 1 at 2. Dr. Samuel Byrd is the Medical Director at Wabash Valley. Dkt. 51-2 ¶ 2. Centurion Health of Indiana, LLC, is a private company that contracts with the Indiana Department of Correction ("IDOC") to provide medical services to inmates. Dkt. 51-3 ¶ 2.

On November 8, 2022, Everage injured himself in a fall. Dkt. 65-1 at 177. It seemed immediately apparent that Everage's clavicle was broken, as the fractured ends of the clavicle were nearly protruding through the skin. *Id.* X-rays were taken of Everage's shoulder that day, which confirmed the fracture. *Id.* at 5, 177. Also on that date, Dr. Byrd submitted an order for Everage to receive Ultram every 8 hours for pain relief, to immobilize Everage's shoulder in a sling, for Everage to receive a bottom-bunk pass, and for ongoing nursing monitoring. Dkt. 51-2 ¶ 3. The Ultram prescription ran through November 14, "consistent with standard prescribing practices for controlled substances in a correctional setting." *Id.* ¶ 5.

On November 9, Everage met with Dr. Byrd. Dkt. 65-1 at 177. Everage asked if he could be sent out immediately for emergency treatment, but Dr. Byrd said Centurion policies required him to first seek approval for Everage to receive off-site treatment. *Id.* at 177-78. Everage recalls that Dr. Byrd "assured me that he would keep me on continuous, uninterrupted pain medication to address the excruciating pain I was experiencing . . . ." *Id.* at 178.

Also on November 9, Dr. Byrd submitted an urgent offsite provider request ("OPR") for Everage to have a consultation with an orthopedic surgeon, Dr. Kurt Madsen. Dkt. 51-2 ¶ 4; Dkt. 65-1 at 239. The OPR stated in part, "[a]lthough IQ criteria met, per IN BUS rules, fractures of clavicles, ribs, or toes require Physician Advisor review. Please advise, thank you." Dkt. 65-1 at 239. "IQ" refers to InterQual, a system Centurion uses "for determining . . . the appropriateness of a patient's level of care." *Id.* at 219, 292. It is not entirely

clear what "IN BUS" means. Dr. Stephanie Riley, Centurion Statewide Medical Director, approved the OPR that same day. Dkt. 51-3 ¶¶ 2, 4.

After an OPR is approved, "the timing of any specialist visit depends on the specialist's availability and the correctional facility's ability to transport the inmate." *Id.* ¶ 5. Centurion and its providers do not have direct control over the scheduling of such visits. *Id.* There does not seem to be any dispute that if Dr. Byrd thought it was medically necessary, he could have requested that Everage be transported to an emergency room for immediate treatment, rather than submitting an OPR. According to Centurion's Provider Manual, "[e]mergency department visits do not require prior authorization." Dkt. 65-1 at 278. Centurion's Technical Proposal for IDOC further states, "[e]mergency services will be available 24 hours a day to address unexpected or acute healthcare needs of incarcerated individuals . . . requiring immediate intervention to evaluate, stabilize, and treat the injured or sick person . . . . Emergent problems include those which may result in death, loss of limb or bodily function, deterioration of function, or severe pain if not attended to immediately." *Id.* at 205, 208.

On November 17, three days after the Ultram prescription ran out, Everage submitted a healthcare request form asking for additional pain management because over-the-counter medications were ineffective. Dkt. 51-2 ¶ 6. On November 19, Everage had an appointment with Dr. Byrd. Dkt. 65-1 at 134 (medical records). Dr. Byrd did not re-prescribe Ultram to Everage at this time. *Id.* Instead, he prescribed Mobic and 500 mg acetaminophen, and instructed nurses to give Everage acetaminophen or ibuprofen from the Wabash Valley in-stock supply until the prescription was filled. *Id.*; dkt. 51-2 ¶ 7.

Everage's initial appointment with Dr. Madsen took place on December 5. Dkt. 51-3 ¶ 6. Dr. Madsen recommended that Everage have surgery as soon as possible. Dkt. 65-1 at 178. Everage recalls Dr. Madsen saying that he should have had surgery immediately after the injury, "because my doubly fractured clavicle was already well along in the healing process, although it was healing in a grossly misaligned fashion." *Id.* On December 6, Dr. Riley approved the surgery request. Dkt. 51-3 ¶ 6. Dr. Madsen performed surgery to repair Everage's injury on December 13. *Id.* ¶ 7. His notes after surgery stated that Everage's fracture had been "trending toward a permanent malunion/nonunion." Dkt. 65-1 at 142.

Everage had a follow-up appointment with Dr. Madsen or an associate on January 9, 2023. Dkt. 51-2 ¶ 11; Dkt. 65-1 at 155-56.[1] Dr. Madsen believed that there were problems with hardware he had placed in Everage's shoulder, that the fracture was not healing properly, and that additional surgery may be needed. *Id.* On January 11, 2023, Dr. Byrd submitted an OPR for approval of additional surgery for Everage. Dkt. 51-3 ¶ 8; Dkt. 65-1 at 157. Centurion approved the OPR on January 13. Dkt. 51-3 ¶ 8. "After further clinical follow-up and surgical planning, Dr. Madsen determined that removal of fractured hardware without revision fixation was the most appropriate surgical approach

[1] The parties seem to agree that Everage met with Dr. Madsen on this date. However, the medical records indicate that he was seen by a Dr. James West. Dkt. 65-1 at 155-56. The Court also notes that Everage alleged in his complaint that his surgical incision became infected because nurses did not change his bandages soon enough after surgery. Dkt. 1 at 4-5. There is no mention of any infection in any of the medical records before the Court, let alone that Dr. Byrd would have been directly responsible for it if one had occurred.

. . . ." *Id.* ¶ 9. On February 24, another OPR was submitted for Everage to have surgery.[2] *Id.* Centurion approved the OPR on February 27. *Id.* On March 24, Everage was informed that per "a doctor's order for an upcoming test or procedure," he needed to stop taking "all thinners/aspirin/Nsaids/IBU . . . until further notice." Dkt. 65-1 at 161.

On March 31, Dr. Madsen performed Everage's second surgery. *Id.* at 163. Dr. Madsen's notes indicated it was "best to just remove the hardware, manipulate the shoulder . . . and allow the fracture nonunion to progress with a possible healing nonoperatively in the future." *Id.*

**B. Procedural History**

At screening, the Court allowed Everage to proceed with the following claims:

- Dr. Byrd was deliberately indifferent to Everage's need for pain medication before the first surgery.
- Dr. Byrd delayed scheduling of both surgeries.
- Everage was denied adequate pain medication based on Centurion policies, practices, or customs.
- Everage's surgeries were delayed due to Centurion policies, practices, or customs requiring that such procedures be requested, reviewed, and approved.

Dkt. 10 at 3. These claims were allowed to proceed under both the Eighth Amendment and Indiana state law. *Id.* at 5.

Defendants moved for summary judgment. Dkt. 50. After Everage responded, Defendants filed a 23-page long reply brief. Dkt. 66. Everage has

[2] The signature on the January OPR appears to be Dr. Byrd's. It is unclear who submitted the February OPR.

moved to strike the reply brief because it significantly exceeds the 15-page limit for reply briefs set forth in Local Rule 7-1(e)(1). The Court **GRANTS** the motion, dkt. [68], pursuant to Local Rule 1-3. Although Local Rule 7-1(e)(2) allows a party to request permission to file an oversized brief for "extraordinary and compelling circumstances," Defendants have failed to show that such circumstances exist here. Everage's response brief was within the Local Rule's 30-page limit for such briefs, and although it is very thorough, the Court sees nothing extraordinarily complex in this case that would warrant exceeding the 15-page reply brief limit by 8 pages. Defendants also did not seek permission to file an oversized brief, in disregard of the Local Rule. The **clerk is directed** to strike Defendants' reply brief. Dkt. [66]. The Court has not considered it in resolving the summary judgment motion.

## III. DISCUSSION

### A. Dr. Byrd

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir.

2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court readily concludes for purposes of the summary judgment motion that Everage's broken clavicle was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Dr. Byrd acted with deliberate indifference—that is, that he "consciously disregarded a serious risk to [Everage]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Everage "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). When assessing whether a medical provider was deliberately indifferent in the provision of treatment to an inmate, or the lack thereof, the entire treatment must "be viewed as a whole." *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *see also Riley v. Waterman*, 126 F.4th 1287, 1297 (7th Cir. 2025) ("an overarching consideration in assessing a deliberate indifference claim is an examination of the totality of circumstances of the patient's care."). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).
- refuses "to take instructions from a specialist." *Id.*
- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.
- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).
- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Here, on the same day that Everage sustained his injury, Dr. Byrd placed orders for a sling to immobilize his arm, a bottom bunk pass, a 7-day Ultram prescription, and continued monitoring by nurses. The next day, Dr. Byrd saw Everage in person. After evaluating him and the x-rays taken the previous day, Dr. Byrd submitted an "urgent" OPM for an orthopedic consultation for Everage. The undisputed designated evidence indicates that at that point, the precise timing of Everage's appointment with Dr. Madsen was out of Dr. Byrd's hands. *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) (defendants cannot be held liable under § 1983 "if the remedial step was not within their power"). The same is true with respect to Dr. Byrd immediately submitting an OPR as to the need for a second surgery. To the extent Everage suggests otherwise, it is purely speculation and conjecture, which is not enough to avoid summary judgment. *See White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (non movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (cleaned up)). Dr. Byrd's actions are not

suggestive of deliberate indifference to Everage's injury because he did not ignore the need for treatment. *E.g.*, *Williams v. Tannan*, 2022 WL 1620347, at *5 (E.D. Wis. May 23, 2022) ("Having to wait before seeing a doctor for a non-emergency situation is not deliberate indifference; it is a fact of life, inside and outside of prison.").

Everage has submitted excerpts regarding treatment of a broken clavicle from what appear to be reputable websites and publications related to medical care. He cites these materials in support of his argument that Dr. Byrd should have immediately arranged for him to have emergency care for his injury after it happened, rather than submitting a request for an orthopedic consultation. The Court opts to consider this evidence under Federal Rule of Evidence 803(18) without ruling that it is admissible or properly presented to the Court. Even assuming without deciding that these websites and publications are admissible and could support his opposition to summary judgment, they do not establish a dispute of material fact on the issue of deliberate indifference.

First, Everage cites to information provided by the Cleveland Clinic, which states in part, "[a] bone fracture is painful, and you'll want to get help with it right away." Dkt. 65-1 at 128. Everage, however, did in fact get help and treatment for his injury right away. He is unhappy with the course of action Dr. Byrd took thereafter. But that does not suggest deliberate indifference. *See Snipes*, 95 F.3d at 591.

Second, Everage cites a passage regarding clavicular fractures from the website of the National Institute of Health's National Library of Medicine. The passage he cites stated in part, "immediate orthopedic consultation should be

obtained for patients with neurovascular compromise, open fractures, tenting of the skin, or any break in the skin near the fracture." Dkt. 65-1 at 132.[3] Based on this information, Everage asserts Dr. Byrd should have sought a more rapid orthopedic consultation for him. However, the Court notes in part that the sentence immediately before the passage Everage quotes states, "[t]he majority of clavicular fractures are managed with conservative care." *Id.* Furthermore, there is no evidence that Everage's injury was so obviously severe that it would have fallen within the parameters quoted above for immediate treatment. For instance, there is no mention of "neurovascular compromise" in the radiologist's interpretation of the November 8 x-ray, nor in Dr. Madsen's notes about Everage.

Even with evidence of an obviously severe clavicular fracture, it is a matter of professional judgment whether Everage needed to immediately go to an ER or whether he could wait for an outside appointment. It is enough to say Dr. Byrd exercised professional judgment, and Everage has not presented evidence that suggests no minimally competent physician would have chosen the course of action that Dr. Byrd chose. If Dr. Madsen did indeed tell Everage that he should have received treatment sooner and that the delay in treatment had caused complications, that simply means, at best, that Dr. Madsen disagreed with Dr. Byrd's medical judgment. But a mere disagreement between medical professionals does not support a deliberate indifference claim. *See Snipes*, 95 F.3d at 591. Nor does the Eighth Amendment guarantee success in medical

---

[3] Everage cites https://www.ncbi.nlm.nih.gov/books/NBK507892/, as last updated on July 21, 2023. It appears this particular entry on clavicular fractures was more recently updated on March 27, 2026, though in relevant part the information it contains is nearly identical to the earlier entry.

treatment. *See Jones v. Sood*, 123 F. App'x 729, 731 (7th Cir. 2005). "[E]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 636 (7th Cir. 2024) (quoting *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022)). *See also Isbell v. Khan*, 2024 WL 4119471, at *3 (N.D. Ind. Sept. 6, 2024) ("The mere fact that complications arose does not show deliberate indifference.").

Regarding Everage's pain management, he recalls Dr. Byrd assuring him at the first appointment "that he would keep me on continuous, uninterrupted pain medication to address the excruciating pain I was experiencing . . . ." Dkt. 65-1 at 177. But Everage simply misunderstands the significance of this statement. Accepting as true for summary judgment purposes that Dr. Byrd said this, it does not necessarily indicate that Dr. Byrd promised to keep Everage on a particular medication indefinitely, or a medication of Everage's choosing. The Seventh Circuit has explained:

> The constitutional prohibition on inflicting unnecessary and wanton pain requires medical officials who know that an incarcerated patient is suffering to take "reasonable measures" to alleviate that pain. But the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free. There are many reasons for doctors to tread carefully when prescribing strong pain medications.

*Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023). "The administration of pain killers requires medical expertise and judgment. Using

them entails risks that doctors must consider in light of the benefits." *Snipes*, 95 F.3d at 592.

Here, Dr. Byrd explained in his declaration in support of summary judgment that he only prescribed Ultram to Everage for a limited time after the injury because of concerns about prescribing controlled substances in a prison. That is a legitimate concern. After the prescription ran out on November 14, Everage did not immediately ask why he was no longer receiving it, but waited three days before submitting a healthcare request form asking for additional pain medication. There is no evidence that Dr. Byrd was directly responsible for another two-day wait for an appointment with Everage, at which time Dr. Byrd prescribed a different pain medication and told nurses to give him available in-stock supplies of extra strength acetaminophen and ibuprofen while waiting for the prescription to be filled. Evidently, it was filled by November 21. This course of action reflects Dr. Byrd's professional judgment, not deliberate indifference. "This is not a case where [defendant] failed to provide any pain relief whatsoever." *Arce*, 75 F.4th at 681.

Finally, Everage asserts that Dr. Byrd took him off any and all painkillers for the week preceding his second surgery, between March 24 and 31, 2023. But This particular order is not evidence that Dr. Byrd was deliberately indifferent to Everage's pain and medical care. First, the medical record Everage cites only states that "a doctor" issued his order; it does not indicate whether it was from Dr. Byrd or Dr. Madsen. Second, the order did not eliminate every pain medication, only certain classes of medication. Third, the Court takes judicial notice that the order at issue here is one that is commonly issued prior to a

patient undergoing major surgery. *See, e.g.*, https://iuhealth.org/find-medical-services/pre-admission-testing (stating that "[i]n general, you will need to hold all anti-inflammatory medications (ibuprofen, naproxen, meloxicam, celecoxib) for one week before surgery.").

In sum, the designated evidence establishes as a matter of law that, after looking at the totality of the circumstances, Dr. Byrd was not deliberately indifferent regarding treatment of Everage's broken clavicle. It is unfortunate that it did not heal as quickly or as properly as would be ideal. The Court also does not doubt that it was very painful. But that is not enough to show that Dr. Byrd violated the Eighth Amendment. "There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Dr. Byrd is entitled to summary judgment.

**B. Centurion**

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). To prevail on a *Monell* claim against Centurion, Everage must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Centurion custom or policy or failure to implement a needed policy. *Id.* Centurion cannot be held liable under the common-law theory of respondeat superior for its employees' actions. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir.

2021). Further, a "pivotal requirement" for any custom claim is a showing of widespread constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

"Liability under this standard is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir. 2022) (cleaned up). Liability may attach in two circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, . . . a plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id.* (cleaned up). Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* (cleaned up). Under this latter theory, a plaintiff "must typically point to evidence of a prior pattern of similar constitutional violations" to "ensure that there is a true municipal policy at issue, not a random event." *Id.* (cleaned up).

Because the Court has found that Dr. Byrd was not deliberately indifferent in his treatment of Everage, this alone would warrant the granting of summary judgment in Centurion's favor. *See Pyles*, 771 F.3d at 412 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)) (stating "Wexford cannot be held liable for damages because there is no underlying constitutional

violation."). And because Everage has not shown a violation of his Eighth Amendment rights, the Court need not consider the affidavits from other inmates alleging delayed or denied medical care resulting from Centurion's policies and procedures.

Moreover, the Court rejects Everage's overall assertion that Centurion's OPR process generally violates the Eighth Amendment because it sometimes causes delays in the provision of healthcare and is driven by cost-saving concerns. Everage quotes from various parts of Centurion's technical proposal to provide healthcare services to the IDOC and its contract with the State of Indiana, both of which refer to various cost-saving measures, including but not limited to the OPR process. But it also is true, and Everage acknowledges, that a medical provider at an individual facility can decide that an inmate needs immediate, emergency medical care, in which case the provider can bypass the OPR process. It also is not unreasonable for a medical provider within a prison setting to provide guidelines and limits for when an inmate should receive care at an outside facility, due to legitimate safety and security concerns with transporting an inmate outside prison.

In any case, to the extent either the technical proposal or contract may indicate that Centurion would attempt to be cost-efficient, that is not the same thing as saying Centurion would cut corners or render medically unreasonable care—much less care that reflects deliberate indifference. The "cost-efficient" language within the technical proposal and contract is simply "standard language that many medical providers and insurers use, inside and out of the prison context. A claim to be 'cost-effective' is not the same thing as saying cost-

effectiveness will override adequate patient care." *Williams v. Archer*, No. 2:22-CV-00181-JRS-MKK, 2024 WL 4333138, at *10 (S.D. Ind. Sept. 27, 2024). And indeed, the technical proposal and contract both contain ample references to Centurion's responsibility to provide adequate and timely medical care to IDOC inmates. The same is true of Centurion's pharmacy management program, which limits prescription choices in prisons. That is a feature of almost any health insurance provider, and persons in and outside of prison must navigate such programs to access prescription medications. *See, e.g.*, https://www.anthem.com/employer/large-group-health-insurance/pharmacy-benefit-plans (stating in part, "Anthem's pharmacy benefits help manage costs while meeting all your business needs"); https://www.anthem.com/in/provider/state-federal/eligibility-pharmacy/pharmacy (identifying third-party company as pharmacy benefits manager).

For the above reasons, Centurion is entitled to summary judgment.

### C. State Law Claims

With Everage's constitutional claims staged for dismissal, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). "Indeed, when the federal claims

are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Everage's state-law claims.

The statute of limitations is not a factor. Both federal and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The Court has not expended significant resources on the pending state-law claims. The Court does not expect that the parties' discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be every bit as relevant in a state-court proceeding.

Further, it is not clear how the state-law claims should be resolved. Defendants have not argued that Everage's claims should be barred for procedural reasons, such as failure to comply with Indiana's Medical Malpractice Act. The factual question of whether Everage's claims can and should proceed is within the particular expertise of Indiana state courts.

Finally, comity always favors allowing state courts to decide issues of state law.

Having resolved all claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Everage's state law claims.

## IV. CONCLUSION

Everage's motion to strike Defendants' reply brief is **GRANTED**. Dkt. [68]. The **clerk is directed** to strike the reply brief, docket [66], from the docket. Notwithstanding the striking of the reply brief, Defendants' motion for summary

judgment is **GRANTED.** Dkt. [50]. Everage's federal claims are **dismissed with prejudice**, and his state law claims are **dismissed without prejudice**. Final judgment consistent with this Order and the Court's screening order, docket [10], shall now issue by separate entry.

**SO ORDERED.**

Date: 8/14/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

WILLIAM EVERAGE
962802
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only